# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**ELIZABETH HERRERA,**

      **Plaintiff,**

    **vs.**                                         **Civ. No. 16-824  KK**

**NANCY A. BERRYHILL,[1]**
**Acting Commissioner of Social Security,**

      **Defendant.**

## MEMORANDUM OPINION AND ORDER[2]

**THIS MATTER** is before the Court on the Social Security Administrative Record (Doc. 13) filed December 2, 2016 in support of Plaintiff Elizabeth Herrera's ("Plaintiff") Complaint (Doc. 1) seeking review of the decision of Defendant Nancy A. Berryhill, Acting Commissioner of the Social Security Administration, ("Defendant" or "Commissioner") denying Plaintiff's claim for Title II disability insurance benefits and for Title XVI supplemental security income benefits.  On January 31, 2017, Plaintiff filed her Motion to Reverse and Remand for Rehearing With Supporting Memorandum ("Motion").  (Doc. 16.)  The Commissioner filed a Response in opposition on April 3, 2017 (Doc. 17), and Plaintiff filed a Reply on April 17, 2017. (Doc. 19.)  The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c).  Having meticulously reviewed the entire record and the applicable law and being fully advised in the premises, the Court finds the Motion is not well taken and is **DENIED.**

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Nancy A. Berryhill is substituted for Carolyn Colvin as the Acting Commissioner of the Social Security Administration.  Fed. R. Civ. P. 25(d).

[2] Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all proceedings, and to enter an order of judgment, in this case.  (Docs. 4, 8, 9.)

# I. <u>Background and Procedural Record</u>

Claimant Elizabeth Herrera ("Ms. Herrera") alleges that she became disabled on October 18, 2008, at the age of forty because of major depressive disorder and migraine headaches. (Tr. 366-67, 368-74, 424.[3]) Ms. Herrera has one year of college, and worked as a dental assistant. (Tr. 425, 430.)

On November 14, 2008, Ms. Herrera protectively filed an application for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. § 401 *et seq.*, and concurrently filed for Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1381 et seq. (Tr. 366-67, 368-74, 432.) Ms. Herrera's applications were initially denied on March 13, 2009. (Tr. 218-19, 243-46.) They were denied again at reconsideration on February 18, 2010. (Tr. 221-22, 250-52, 253-56.) On August 16, 2010, Ms. Herrera requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 261-62.) ALJ Ben Wilner conducted a hearing on December 8, 2011. (Tr. 147-76.) Ms. Herrera appeared in person at the hearing and was represented by Attorney Michael Armstrong. (*Id.*) The ALJ took testimony from Ms. Herrera (Tr. 152-76). On May 22, 2012, the ALJ issued a decision for which the claimant sought review. (Tr. 240.) On March 14, 2013, the Appeals Council remanded the case to the ALJ for resolution of certain issues.[4] (Tr. 240-41.)

ALJ Wilner conducted a second hearing on November 5, 2013. (Tr. 177-217.) Ms. Herrera appeared in person at the hearing and was represented by Attorney Michael Armstrong. (*Id.*) The ALJ took testimony from Ms. Herrera (Tr. 182-211), and from an

---

[3] Citations to "Tr." are to the Transcript of the Administrative Record (Doc. 13) that was lodged with the Court on December 2, 2016.

[4] The Appeals Council determined that (1) the ALJ found severe physical impairments, but imposed no physical limitations in the RFC assessment; (2) the ALJ failed to consider the effect of Ms. Herrera's obesity on her other severe impairments; and (3) the ALJ failed to utilize a vocational expert to determine the extent to which Ms. Herrera's mental impairments eroded the occupational base. (Tr. 240.)

impartial vocational expert (VE), Thomas Greiner. (Tr. 211-17.) On January 21, 2014, the ALJ issued a decision denying Ms. Herrera's claims. (Tr. 123-140.) On May 13, 2016, the Appeals Council issued its decision denying Ms. Herrera's request for review and upholding the ALJ's final decision. (Tr. 1-4.)

On July 15, 2016, Ms. Herrera timely filed a Complaint seeking judicial review of the Commissioner's final decision. (Doc. 1.)

## II. <u>Standard of Review</u>

The Court reviews the Commissioner's decision to determine whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004). A decision is based on substantial evidence where it is supported by "relevant evidence . . . a reasonable mind might accept as adequate to support a conclusion." *Langley*, 373 F.3d at 1118. A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *Langley,* 373 F.3d at 1118, or "constitutes mere conclusion." *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992). The Commissioner's decision must "provide this court with a sufficient basis to determine that appropriate legal principles have been followed." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005). Therefore, although an ALJ is not required to discuss every piece of evidence, "the record must demonstrate that the ALJ considered all of the evidence," and "the [ALJ's] reasons for finding a claimant not disabled" must be "articulated with sufficient particularity." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996).

In considering an application for disability insurance benefits, the Commissioner uses a five-step sequential evaluation process. 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). The claimant bears the burden of establishing a prima facie case of

disability at steps one through four. 20 C.F.R. §§ 404.1520(a)(4)(i-iv), 416.920(a)(4)(i-iv); *Grogan v. Barnhart,* 399 F.3d 1257, 1261 (10th Cir. 2005). If the claimant successfully meets that burden, the burden of proof shifts to the Commissioner at step five to show that the claimant is able to perform other work in the national economy, considering the claimant's RFC, age, education, and work experience. 404.1520(a)(v), 416.920(a)(v); *Grogan*, 399 F.3d at 1261.

### III. <u>Analysis</u>

The ALJ made his decision that Ms. Herrera was not disabled at step five of the sequential evaluation. He found that Ms. Herrera had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she could do

> work involving only simple tasks and requiring only simple decisions; maintaining concentration, pace, and persistence for two hours before taking a regularly scheduled break, and then returning to work throughout the workday.

(Tr. 135.) Based on the RFC and the testimony of the VE, the ALJ concluded that considering Ms. Herrera's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that she could perform and that she was therefore not disabled. (Tr. 138-39.)

Ms. Herrera asserts three arguments in support of her Motion as follows: (1) the ALJ failed to provide specific and legitimate reasons for rejecting the medical source opinion of treating physicians Dr. Donna Segarra, D.O., and Dr. E. B. Hall, M.D.; (2) the ALJ failed to provide specific and legitimate reasons for rejecting the other medical source opinion of treating counselor Elizabeth Ewins, M.A., LPCC; and (3) the ALJ failed to incorporate portions of the medical opinion of state agency psychological consultant Dr. Alvin Smith, M.D., into Ms. Herrera's RFC. For the reasons discussed below, the Court finds that the ALJ applied the correct legal standards in evaluating the treating physician and other medical source opinions. The Court further finds that the ALJ adequately incorporated the functional aspects of

4

Ms. Herrera's nonexertional limitations assessed by nonexamining State agency psychological consultant Dr. Alvin Smith. For these reasons, there is no reversible error.

### A.    <u>Treating Physicians</u>

#### 1.    <u>Donna Segarra, D.O.</u>

On October 25, 2012, Ms. Herrera presented to Donna Segarra, D.O., at Molina Medical and stated she wanted to establish care and needed a flu vaccine. (Tr. 1057.) Dr. Segarra noted, *inter alia*, Ms. Herrera's reported medical history that included severe migraines, depression, anxiety, fibromyalgia, and sleep apnea. (*Id.*) Ms. Herrera reported her current medications as Cymbalta, Lithium, Propranolol, Relpax and Sumatriptan. (*Id.*) Dr. Segarra administered a flu vaccine, ordered lab work, and instructed Ms. Herrera to continue on her current medications. (Tr. 1054.) Ms. Herrera returned on December 19, 2012, to review her labs. (Tr. 1053.) The only other treatment note by Dr. Segarra in the Administrative Record is a partial note dated eleven months later on October 16, 2013. (Tr. 1051.)

On October 23, 2013, Dr. Segarra completed a Medical Assessment of Ability To Do Work-Related Activities (Non-Physical) and indicated that Ms. Herrera suffered with moderate pain, and had sleep disturbances due to sleep apnea that required her to rest or lie down at regular intervals. (Tr. 1081.) Dr. Segarra assessed that Ms. Herrera had *slight limitations* in her ability to (1) maintain regular attendance and be punctual within customary tolerance; (2) work in coordination with/or proximity to others without being distracted by them; and (3) to make simple work-related decisions. (*Id.*) She assessed that Ms. Herrera had *moderate limitations* in her ability to (1) maintain attention and concentration for extended periods (*i.e.,* 2-hour segments); (2) perform activities within a schedule; (3) maintain physical effort for long periods without a need to decrease activity or pace, or to rest intermittently; and (4) sustain an ordinary routine without special supervision. (*Id.*) Dr. Segarra assessed Ms. Herrera had *marked*

*limitations* in her ability to complete a normal workday and workweek without interruptions from pain or fatigue based symptoms and to perform at a consistent pace without unreasonable number and length of rest periods. (*Id.*)

On the same date, Dr. Segarra also completed a Medical Assessment of Ability To Do Work-Related Activities (Physical). (Tr. 1082.) She indicated that due to pain and fatigue Ms. Herrera could not maintain physical activities for long periods without a need to decrease activity or pace, or to rest intermittently. (*Id.*) She also assessed that pain limited Ms. Herrera's ability to push and/or pull in her upper and lower extremities. (*Id.*) Based on Ms. Herrera's self-reported inability to lift,[5] Dr. Segarra assessed that Ms. Herrera could lift less than five pounds. (*Id.*) Based on Ms. Herrera's self-reported history and symptoms, Dr. Segarra assessed that Ms. Herrera could stand and/or walk for less than 2 hours in an 8-hour workday, must periodically alternate sitting and standing to relieve pain or discomfort, had limited ability to reach in all directions, could occasionally kneel, stoop, and crouch, and could never crawl. (*Id.*)

The ALJ accorded little weight to Dr. Segarra's assessment. (Tr. 132.) He explained that it was highly inconsistent with her treatment records, internally inconsistent, and inconsistent with the medical evidence as a whole. (Tr. 132, 137.) Ms. Herrera argues that the ALJ's explanation is inadequate because he failed to identify the specific inconsistencies he relied on in rejecting Dr. Segarra's assessment. (Doc. 16 at 13.) Ms. Herrera further argues that the ALJ improperly rejected Dr. Segarra's physical assessment that included pain associated with fibromyalgia,[6] because Dr. Segarra's treatment notes support that Ms. Herrera had fibromyalgia, and the ALJ listed Ms. Herrera's fibromyalgia as a severe impairment. (Doc. 16 at 13-14.) The Commissioner contends that the ALJ appropriately relied on the inconsistency of Dr. Segarra's

---

[5] Dr. Segarra noted that she had not done any objective testing. (Tr. 1082.)

[6] Dr. Segarra's assessment does not identify a specific source of Ms. Herrera's moderate pain.

opinion with her treatment notes and the record as a whole, and that the ALJ discussed certain medical records to demonstrate the inconsistencies. (Doc. 17 at 5-6.)

The Tenth Circuit has pointed out that an ALJ "must give good reasons for the weight assigned to a treating physician's opinion," and "[t]he reasons must be sufficiently specific to make clear to any subsequent reviewers the weight the [ALJ] gave to the treating source's medical opinion and the reason for that weight." *Allman v. Colvin*, 813 F.3d 1326, 1332 (10th Cir. 2016) (ellipses, citation and internal quotation marks omitted). Further, if the treating physician's opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is consistent with the other substantial evidence in the record . . . the ALJ must give the opinion controlling weight." *Id.* at 1331. "But if the ALJ decides that the treating physician's opinion is not entitled to controlling weight, the ALJ must then consider whether the opinion should be rejected altogether or assigned some lesser weight." *Id.* In making this determination, the ALJ considers several factors provided in 20 C.F.R. §§ 404.1527(c) and 416.927(c).[7] *Id.* at 1331-32. The ALJ is not required to "apply expressly" every relevant factor. *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007).

The ALJ provided specific and legitimate reasons for rejecting Dr. Segarra's assessments. The ALJ explained that Dr. Segarra's assessments were completed in "late 2013."[8] The ALJ also explained that they were inconsistent with her own treatment records, internally inconsistent, and inconsistent with other evidence in the record. In doing so, the ALJ cited to specific inconsistencies. For example, the ALJ explained that Dr. Segarra "disqualified her own

---

[7] These factors include examining relationship, treatment relationship, supportability, consistency, specialization and other factors. 20 C.F.R. §§ 404.1527(c) and 416.927(c).

[8] Ms. Herrera protectively filed her disability claims on November 14, 2008, and alleged an onset date of October 18, 2008. (Tr. 419.) Thus, the assessment is dated five years after Ms. Herrera's alleged onset date.

opinion" because she noted that she relied only on Ms. Herrera's subjective complaints,[9] as opposed to objective findings, in assessing Ms. Herrera's physical limitations. (Tr. 137.) The record supports this finding.[10] (Tr. 1082.) The ALJ also pointed out that Ms. Herrera was referred to physical therapy in 2012 for pain related to her fibromyalgia (*i.e.,* back pain) and migraine headaches, and that her symptoms improved with physical therapy such that her headaches were occurring inconsistently and less frequently.[11] (Tr. 135-36.) The record supports this finding. (Tr. 913.) Finally, the ALJ noted that Ms. Herrera reported to Psychiatrist E. B. Hall on August 24, 2012, that she was taking medication for migraines only about once every two weeks.[12] (Tr. 136.) The record supports this finding. (Tr. 999.) These are legitimate

---

[9] The ALJ determined elsewhere in his determination that Ms. Herrera's statements about the intensity, persistence, and limiting effects of her symptoms were not consistent with the objective medical evidence and other evidence. (Tr. 136.) *See* SSR 16-3p, 2016 WL 1119029, at *6 (a claimant's statements about the intensity, persistence, and limiting effects of symptoms are evaluated based on their consistency with objective medical evidence and other evidence). Ms. Herrera raised no objection to the ALJ's evaluation of her statements regarding the intensity, persistence, and limiting effects of her symptoms.

[10] The Court's review of the record supports that Dr. Segarra's three treatment notes do not contain evidence of any objective testing to assess Ms. Herrera's ability to do work-related physical activities. (Tr. 1051, 1052-53, 1054-57.)

[11] On July 25, 2011, based on a referral by Maryalyse Mercado, M.D., Neurologist Joanna Katzman, M.D., evaluated Ms. Herrera for chronic pain associated with depression, anxiety, migraines, and possible fibromyalgia. (Tr. 677-78.) Based on Ms. Herrera's reported clinical history, Dr. Katzman assessed that Ms. Herrera most likely had fibromyalgia. (Tr. 678.) Dr. Katzman noted she planned to obtain lab studies to rule out any possible causes. (*Id.*) Dr. Katzman recommended that Ms. Herrera consider Lyrica or gabapentin. (*Id.*) Dr. Katzman noted, however, that the most important treatment for fibromyalgia was mobility and that Ms. Herrera should enter an exercise program and/or consider yoga where she could lose weight. (*Id.*) Dr. Katzman ordered physical therapy for assistance with appropriate stretching, strengthening and posture. (*Id.*) Dr. Katzman also ordered a C-Spine to rule out causes of headaches. (*Id.*) The C-Spine demonstrated some mild degenerative disc disease at C4-C6, but was otherwise normal. (Tr. 680.) From January 13, 2012, until April 5, 2012, Ms. Herrera attended seven physical therapy sessions. (Tr. 913.) Ms. Herrera reported at the initial evaluation that she experienced 4-5 migraines per week and had back pain exacerbated by activities such as washing dishes and vacuuming. (Tr. 935.) At discharge the physical therapist noted that Ms. Herrera reported she had not experienced a headache for the last 10-12 days, and that the pain she originally felt in her lower, mid and upper back was now described as "soreness" with a pain level of 2/10. (*Id.*) The physical therapist indicated that Ms. Herrera was independent with her home exercise program and was discharged. (*Id.*)

[12] Ms. Herrera first saw Psychiatrist E.B. Hall from January 10, 2012, through August 24, 2012. (Tr. 997-1012.) Her chief complaints were depression and fibromyalgia. (Tr. 1014.) Ms. Herrera completed seven Patient Self-Evaluation Forms during her treatment with Dr. Hall and/or PA-C Belina Avner. (Tr. 999, 1001, 1003, 1005, 1007, 1009, 1011.) She reported only twice that she was having symptoms related to headaches. (Tr. 1003, 1009.) Additionally, Dr. Hall noted that Propranolol helped Ms. Herrera's migraines (Tr. 1006, 1009) and Cymbalta helped her fibromyalgia (Tr. 1001, 1005, 1009-10).

reasons for according less weight to a medical opinion. *See* 20 C.F.R. §§ 404.1527(c)(2), (3), (4) and (5) and 416.927(c)(2), (3), (4) and (5) (generally more weight will be given to medical source opinions based on how long treating sources have treated you, how frequently they have examined you, the nature and extent of the treatment relationship, whether their opinions are supported by relevant evidence, particularly medical signs and laboratory findings, whether their opinions are consistent with the record as a whole, and if they are specialists providing medical opinions about medical issues related to their area of specialty); *see also Pisciotta v. Astrue*, 500 F.3d 1074, 1078 (10th Cir. 2007) ("Medical evidence may be discounted if it is internally inconsistent or inconsistent with other evidence.") (quoting *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995)).[13]

The Court is also not persuaded that the ALJ improperly ignored Ms. Herrera's physical pain associated with fibromyalgia in rejecting Dr. Segarra's physical assessment. First, there is nothing in Dr. Segarra's three treatment notes to support that she did anything beyond recording and acknowledging Ms. Herrera's reported medical history of fibromyalgia. (Tr. 1051, 1052-53, 1054-57.) In other words, her treatment notes do not reflect any kind of independent physical exam or assessment related to Ms. Herrera's fibromyalgia. Dr. Segarra confirmed as much when she noted on the medical source statement that her physical assessment was based solely on Ms. Herrera's reported history and subjective complaints. (Tr. 1082.) Second, Ms. Herrera's argument that finding an impairment at step two should automatically result in limitations at

---

[13] The Court further notes that although Dr. Segarra saw Ms. Herrera one week before she completed her assessment, it had been ten months since her last appointment (when her labs were reviewed). (Tr. 1051, 1052-53.) The form also instructs Dr. Segarra to consider Ms. Herrera's medical history and the chronicity of findings from 2011 to current examination, but Dr. Segarra only saw Ms. Herrera for the first time on October 25, 2012. (Tr. 1057.) Further, there is no evidence in the Administrative Record of medical care related to Ms. Herrera's migraines and/or fibromyalgia from any other medical provider in the months leading up to Dr. Segarra's assessment, nor is there evidence in the Administrative Record of any medical care related to Ms. Herrera's migraines and/or fibromyalgia after Dr. Segarra completed the assessment. On November 5, 2013, Ms. Herrera testified that she continued to take medication as needed for migraines, but she did not testify how often they occurred. (Tr. 197.) She also testified that her fibromyalgia pain was mild and under control with Cymbalta. (Tr. 198-199.)

steps four and five is misplaced. At step two, an ALJ considers the medical severity of a claimant's impairments. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). An ALJ's findings at step two require only a "de minimis" showing of impairment. *Hinkle v. Apfel*, 132 F.3d 1349, 1352 (10ᵗʰ Cir. 1997); *see also Williams v. Bowen*, 844 F.2d 748, 751 (10ᵗʰ Cir. 1988) (stating that if a claimant is able to show that his impairment would have more than a minimal effect on his ability to do basic work activity he has made a *de minimus* showing). When a claimant's impairments do not meet or equal in severity the requirements of any impairments in the Listings, as is the case here, the ALJ uses his step two findings as a basis for his step four and five findings. SSR 96-8p, 1996 WL 374184, at *2 (instructing that an adjudicator must consider only limitations and restrictions attributable to medically determinable impairments). Thus, whether an identified impairment causes physical or mental limitations or restrictions that affect a claimant's capacity to do work-related physical and mental activities at steps four and five is an entirely separate and different analysis. Here, the ALJ considered Ms. Herrera's fibromyalgia in his RFC assessment, as he was required to do. SSR 96-8p, 1996 WL 374184, at *5 (the RFC assessment must be based on *all* the relevant evidence in the record) (emphasis in original); see also SSR 12-2p, 2012 WL 3104869, at *6 (guidance for determining the RFC assessment for a person with fibromyalgia). He explicitly stated that he had carefully considered the entire record in assessing Ms. Herrera's RFC. (Tr. 134-35.) Elsewhere in his determination, the ALJ stated he allowed for Ms. Herrera's chronic pain, depression, migraines and sleep problems in assessing her mental RFC, and considered Ms. Herrera's obesity and limited motivation for exertion in restricting her to light work. (Tr. 136.) The Tenth Circuit has stated that it will take the ALJ at his word when the entirety of the ALJ's discussion of the evidence and the reasons for his conclusions demonstrate that he adequately considered the claimant's impairments. *Wall v.*

*Astrue*, 561 F.3d 1048, 1070 (10th Cir. 2009). The ALJ's discussion and the reasons for his conclusions demonstrate he did so here.

For the foregoing reasons, the ALJ provided legitimate reasons for rejecting Dr. Segarra's assessment and there is no reversible error as to this issue.

### 2. <u>E. B. Hall, M.D.</u>

On January 10, 2012, Ms. Herrera presented to Psychiatrist E. B. Hall, M.D. (Tr. 1013-15.) Dr. Hall noted that Ms. Herrera was transferring from UNM and her chief complaints were depression and fibromyalgia. (Tr. 977-996, 1014.) Dr. Hall performed a mental status exam that was normal, except that he noted Ms. Herrera's mood was depressed and irritable.[14] (Tr. 1015.) Dr. Hall provided Axis I provisional diagnoses of chronic depression and anxiety, and assigned GAF scores of 50 and 55.[15] (Tr. 977, 1015.) Ms. Herrera completed seven Patient Self-Evaluation Forms during her eight months of treatment with Dr. Hall and/or PA-C Belina Avner. (Tr. 999, 1001, 1003, 1005, 1007, 1009, 1011.) Her most consistent complaints related to trouble falling and staying asleep.[16] (*Id.*) Dr. Hall noted that Propranolol helped Ms. Herrera's migraines (Tr. 1006, 1009) and that Cymbalta helped her fibromyalgia (Tr. 1001, 1005, 1009-10). On August 24, 2012, Ms. Herrera reported she was "doing well," although she

---

[14] Dr. Hall noted that Ms. Herrera was alert, was average intelligence, had normal speech, normal language, normal insight and judgment, normal cognition, and organized thought processes. (Tr. 1015.) He further noted that Ms. Herrera's mood was depressed and irritable, and that she had helpless/hopeless thought content. (*Id.*) He noted that she was not having suicidal thoughts. (*Id.*)

[15] The GAF is a subjective determination based on a scale of 100 to 1 of a "clinician's judgment of the individual's overall level of functioning." *Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders* (4th ed. 2000) at 32. A GAF score of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job). *See Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders* (4th ed. 2000) at 34. A GAF score of 51-60 indicates moderate symptoms (*e.g.,* flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers. *Id.*

[16] Dr. Hall referred Ms. Herrera for a sleep study which was positive for obstructive sleep apnea. (Tr. 999, 1021-1024.)

was concerned about being over medicated.  (Tr. 999.)  PA-C Avner decreased certain of her medications, and told her to follow up in eight months or sooner if necessary.  (*Id.*)

Fourteen months later, on October 23, 2013, Dr. Hall completed Listing 12.04 *Affective Disorder* and 12.06 *Anxiety-Related Disorder* forms on Ms. Herrera's behalf and indicated that she met the A, B and C criteria for both.  (Tr. 1078, 1079.)  *See* 20 C.F.R. pt. 404, subpt. P. app. 1, 12.00.A, 12.04, and 12.06 (explaining the criteria and required level of severity to meet a listing).  Dr. Hall also completed a Medical Assessment of Ability To Do Work-Related Activities (Mental) and assessed that due to Ms. Herrera's complex medical psychiatric conditions, migraines, fibromyalgia and sleep apnea, she had *moderate limitations* in her ability to (1) remember locations and work-like procedures; (2) carry out very short and simple instructions; (3) perform activities within a schedule, maintain regular attendance and be punctual within customary tolerance; (4) work in coordination with/or proximity to others without being distracted by them; (5) make simple work-related decisions; (6) interact appropriately with the general public; (7) ask simple questions or request assistance; (8) accept instructions and respond appropriately to criticism from supervisors; (9) get along with co-workers or peers without distracting them or exhibiting behavioral extremes; (10) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; (11) respond appropriately to changes in the work place;  (12) be aware of normal hazards and take adequate precautions; (13) travel in unfamiliar places or use public transportation; and (14) set realistic goals or make plans independently of others.  (Tr. 1077.)  He assessed that Ms. Herrera had *marked limitations* in her ability to (1) understand and remember very short and simple instructions; (2) understand and remember detailed instructions; (3) carry out detailed instructions; (4) maintain attention and concentration for extended periods of time (*i.e.* 2-hour segments); (5) sustain an ordinary routine without special supervision; and (6) complete a normal

workday and workweek without interruptions from psychological based symptoms and to perform at a consistent pace without unreasonable number and length of rest periods. (*Id.*)[17]

The ALJ accorded little weight to Dr. Hall's October 23, 2013, assessment. (Tr. 132.) He explained that it was highly inconsistent with his treatment records, internally inconsistent, and inconsistent with the medical evidence as a whole. (Tr. 132.) Ms. Herrera argues that the ALJ failed to follow the two-step sequential procedure in assessing the opinion of a treating physician and that the ALJ's decision does not mention the controlling-weight inquiry at all. (Doc. 16 at 14.) She further argues that the ALJ failed to provide specific, legitimate reasons for rejecting Dr. Hall's opinion. (*Id.* at 15.) The Commissioner contends the ALJ properly considered and weighed Dr. Hall's opinion, and that Ms. Herrera was not prejudiced by the ALJ's oversight in not explicitly finding that Dr. Hall's opinion was not entitled to controlling weight. (Doc. 17 at 6-8.)

The Court can tell from the ALJ's determination that he declined to give controlling weight to Dr. Hall's opinion. Further, the ALJ made clear to subsequent reviewers the weight he accorded to Dr. Hall's opinion, as he was required to do. *See Tarpley v. Colvin*, 601 F. App'x 641, 643-44 (10th Cir. 2015) (finding ALJ's failure to explicitly state whether treating physician was entitled to controlling weight was harmless where ALJ adequately explained weight given); *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003) (an ALJ's decision must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight). As such, the Court will not reverse on this ground. *Mays v. Colvin*, 739 F.3d 369, 575 (10th Cir. 2014).

---

[17] Ms. Herrera submitted an additional 35 pages of evidence from Dr. Hall for the period from June 19, 2015, to February 26, 2016. (Tr. 2, 116-121.) The Appeals Council determined that this new information was about a later time and it was not made part of the Administrative Record. (Tr. 2.)

The ALJ also provided specific and legitimate reasons for rejecting Dr. Hall's assessments. The ALJ explained that Dr. Hall's assessment was completed in "late 2013."[18] The ALJ also explained that it was inconsistent with Dr. Hall's own treatment records, internally inconsistent, and inconsistent with other evidence in the record. In so doing, the ALJ cited to specific inconsistencies. For example, the ALJ noted that Ms. Herrera reported to Dr. Hall in August 2012 that she was experiencing migraines only about once every two weeks. (Tr. 136.) The record supports this finding.[19] (Tr. 999.) The ALJ explained that Dr. Hall offered detailed opinions in his medical source statement that Ms. Herrera had no more than *moderate limitations* in social interaction and adaptation, but then completed listing forms that indicated she had *marked* limitations in social functioning.[20] (Tr. 133-34.) The record supports this finding. (Tr. 1077-79.) The ALJ also explained that Dr. Hall assessed on the listing forms that Ms. Herrera had *marked limitations* in all domains, had repeated episodes of decompensation of extended duration, and that she had a "complete inability to function independently outside the area of one's home," but that Ms. Herrera's testimony and record evidence demonstrated that Ms. Herrera drives, shops, runs errands, gambles at casinos, and is able to care for herself and her daughter. (Tr. 132, 134, 136.) The record supports this finding. (Tr. 153, 160, 165, 184, 190, 193, 194-95, 478, 481, 532, 587, 597, 627, 660, 672, 677.) These are legitimate reasons for according less weight to a medical opinion. *See* 20 C.F.R. §§ 404.1527(c)(2), (3) and (4) and 416.927(c)(2), (3) and (4) (generally more weight will be given to medical source opinions based

---

[18] *See* fn. 8, *supra.*

[19] Dr. Hall's records noted that Propranolol helped Ms. Herrera's migraines (Tr. 1006, 1009) and Cymbalta helped her fibromyalgia (Tr. 1001, 1005, 1009-10.)

[20] Ms. Herrera argues that the forms are constructed for different purposes such that indicating moderate limitations on one form may not be inconsistent with indicating marked limitations on another. (Doc. 19 at 3.) The Court is not persuaded. Ms. Herrera failed to point to any authority that defines "moderate" and "marked" as *consistent* terms depending on the particular form that is being completed.

on how long treating sources have treated you, how frequently they have examined you, the nature and extent of the treatment relationship, whether their opinions are supported by relevant evidence, particularly medical signs and laboratory findings, and whether their opinions are consistent with the record as a whole); *see also Pisciotta v. Astrue*, 500 F.3d 1074, 1078 (10th Cir. 2007) ("Medical evidence may be discounted if it is internally inconsistent or inconsistent with other evidence.") (quoting *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995)).[21] Although Ms. Herrera points to evidence that Dr. Hall's treatment notes were consistent with his opinion because she reported being isolative and unhappy, and that her impairments continued to "problematize [her] functioning" (Doc. 16 at 15), this argument asks the Court to reweigh the evidence, which the Court does not do. *See Oldham v. Astrue*, 509 F.3d 1254, 1257-58 (10th Cir. 2007) ("We review only the sufficiency of the evidence, not its weight . . . . Although the evidence may also have supported contrary findings, we may not displace the agency's choice between two fairly conflicting views . . . .").

For the foregoing reasons, the Court finds that the ALJ applied the correct legal standard in evaluating Dr. Hall's opinion and provided legitimate reasons that are supported by substantial evidence for the weight he accorded Dr. Hall's opinion. There is no reversible error on this point.

---

[21] The Court's review of the Administrative Record demonstrates that Dr. Hall had not seen or treated Ms. Herrera for well over a year when he completed his assessment, and that she reported doing well at her last appointment. (Tr. 999.)  The Court further notes that on November 5, 2013, just two weeks after Dr. Hall's assessment, Ms. Herrera testified that she took medication for her depressive episodes, had a CPAP machine for sleep apnea, took medication as needed for migraines, and that her fibromyalgia pain was mild and under control with Cymbalta. (Tr. 196-199.)

### B.    LPCC Elizabeth Ewins

Ms. Herrera began treating with LPCC Elizabeth Ewins at Dragonfly Counseling Associates on March 7, 2012, and was discharged on November 12, 2013.[22]  (Tr. 1086, 1092.) There are only two progress notes in the Administrative Record prepared by LPCC Ewins – one dated March 7, 2012,[23] and the other dated December 19, 2012.[24] (Tr. 1086, 1090-91.)  On April 30, 2013, LPCC Ewins prepared a Quarterly Treatment Plan Review and indicated that Ms. Herrera was making minimal progress and becoming more introspective.  (Tr. 1089.)  On November 12, 2013, LPCC Ewins completed a Discharge Summary and noted that her last face-to-face with Ms. Herrera was on June 4, 2013.  (Doc. 1092.)  She noted that Ms. Herrera had presented with chronic depression, dysthymia, and had had some temporary lifting of mood, but no major sustained changes.  (*Id*.)  LPCC Ewins noted that Ms. Herrera did not follow up on assignments consistently and could not sustain enthusiasm.  (*Id.*)  LPCC Ewins indicated that Ms. Herrera had dropped out of counseling.  (*Id.*)

---

[22] Ms. Herrera initially began treating at Dragonfly Counseling Associates on July 13, 2011, with LMSW Sharon Hogland.  (Tr. 675-76.)  On November 19, 2011, LMSW Hogland completed a Listing 12.04 Affective Disorder form and indicated that Ms. Herrera met the A criteria.  (Tr. 696.)  She also completed a  Medical Assessment of Ability To Do Work-Related Activities (Mental) and assessed that Ms. Herrera had mostly *slight limitations* in her ability to do work-related mental activities; however, she assessed *moderate limitations* in her ability to (1) carry out detailed instructions, (2) maintain attention and concentration for extended periods of time (i.e. 2-hour segments); (3) complete a normal workday and workweek without interruptions from psychological based symptoms and to perform at a consistent pace without unreasonable number and length of rest periods; (4) accept instructions and respond appropriately to criticism from supervisors; and (5) respond appropriately to changes in the work place. (Tr. 695.)

[23] LPCC Ewins noted that Ms. Herrera reported she was still grieving the loss of her fiancé from six years earlier, and that her migraines and fibromyalgia were exacerbated by incomplete grief.  (Tr. 1086.)  LPCC Ewins assessed Adjustment Disorder With Mixed Disturbance of Emotion and Conduct; Major Depressive Episode (single) by history; and Bereavement.  (*Id*.)  She assigned a GAF of 56 (moderate symptoms).  (*Id*.)  She planned to address issues in individual sessions and to refer Ms. Herrera to anger management.  (*Id.*)

[24] LPCC Ewins noted that despite medication, Ms. Herrera reported eating irregularities, hypersomnia, fatigue, low energy, and irritability.  (Tr. 1085.)  She assessed Adjustment Disorder With Mixed Disturbance of Emotion and Conduct; Dysthymic Disorder; Major Depressive Episode (single) by history; and Bereavement by history.  (*Id.*) She assigned a GAF score of 56 (moderate symptoms).  (*Id.*)  She planned to address issues in individual sessions. (*Id.*)

On November 7, 2013, LPCC Ewins completed Listing 12.04 *Affective Disorder*, 12.06 *Anxiety-Related Disorder*, and 12.08 *Personality Disorders* forms on Ms. Herrera's behalf and indicated that she met the criteria for all three listings. (Tr. 1096-1098.) *See* 20 C.F.R. pt. 404, subpt. P. app. 1, 12.00.A, 12.04, 12.06 and 12.08 (explaining the criteria and required level of severity to meet a listing). LPCC Ewins also completed a Medical Assessment of Ability To Do Work-Related Activities (Mental) and assessed that Ms. Herrera had *slight limitations* in her ability to (1) understand and remember very short and simple instructions; (2) interact appropriately with the general public; (3) ask simple questions or request assistance; (4) accept instructions and respond appropriately to criticism from supervisors; (5) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; (6) respond appropriately to changes in the work place; and (7) be aware of normal hazards and take adequate precautions. (Tr. 1094-95.) LPCC Ewins assessed that Ms. Herrera had *moderate limitations* in her ability to (1) remember locations and work-like procedures; (2) understand and remember detailed instructions; (3) carry out very short and simple instructions; (4) carry out detailed instructions; (5) make simple work-related decisions; and (6) get along with co-workers or peers without distracting them or exhibiting behavioral extremes. (*Id.*) LPCC Ewins assessed that Ms. Herrera had *marked limitations* in her ability to (1) maintain attention and concentration for extended periods of time (i.e. 2-hour segments); (2) perform activities within a schedule, maintain regular attendance and be punctual within customary tolerance; (3) sustain an ordinary routine without special supervision; (4) work in coordination with/or proximity to others without being distracted by them; (5) complete a normal workday and workweek without interruptions from psychological based symptoms and to perform at a consistent pace without unreasonable number and length of rest periods; (6) travel in unfamiliar places or use public transportation;

and (7) set realistic goals or make plans independently of others.  (*Id.*)  LPCC Ewins commented that Ms. Herrera had difficulty motivating herself and/or fulfilling commitments.  (Tr. 1095.)

The ALJ accorded little weight to LPCC Ewins' assessment.  (Tr. 132.)  He explained that it was highly inconsistent with her treatment records, internally inconsistent, and inconsistent with the medical evidence as a whole.  (Tr. 132-33.)  Ms. Herrera argues that the ALJ failed to cite to the specific evidence that rendered her assessment unsupported.  (Doc. 16 at 18.)  Ms. Herrera further argues that LPCC Ewins' assessment is consistent with her own treatment records.  (*Id.*)  The Commissioner contends that the ALJ reasonably pointed out that LPCC Ewins completed the medical source statement and listing forms five months after last seeing Ms. Herrera, and that her findings therein were contradictory.  (Doc. 17 at 8-9.)

The regulations state that all relevant evidence will be considered when making a determination about whether an individual is disabled.  20 C.F.R. §§ 404.1527(b) and 416.927(b).  The regulations also contemplate the use of information from "other sources," both medical and non-medical, in making a determination about whether an individual is disabled.  *Frantz v. Astrue*, 509 F.3d 1299, 1301 (10th Cir. 2007) (citing 20 C.F.R. §§ 404.1502, 404.1513(d), 416.902, 416.913(d)).  Evidence from other medical sources[25] may be used "to show the severity of an individual's impairment(s) and how it affects the individual's ability to function."  *Id.*; *see* SSR 06-03p, 2006 WL 2329939, at *2.  "Information from these 'other sources' cannot establish the existence of a medically determinable impairment.  Instead, there must be evidence from an 'acceptable medical source'[26] for this purpose."  SSR 06-03p, 2006 WL 2329939, at *2.  An ALJ is required to explain the weight given to opinions from other

---

[25] Other medical sources are nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapist.  SSR 06-03p, 2006 WL 2329939, at *2.

[26] "Acceptable medical sources" are licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists.  SSR 06-03p, 2006 WL 2329939, at *1.

medical sources and non-medical sources who have seen a claimant in their professional capacity, "or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." *Id.* at \*6; *see also Keyes-Zachary v. Astrue,* 695 F.3d 1156, 1163 (10th Cir. 2012) (finding that ALJ was required to explain the amount of weight given to other medical source opinion or sufficiently permit reviewer to follow adjudicator's reasoning). The weight given to this evidence will vary according to the particular facts of the case, the source of the opinion, the source's qualifications, the issues that the opinion is about, and other factors, *i.e.,* how long the source has known and how frequently the source has seen the individual; how consistent the opinion is with other evidence; the degree to which the source presents relevant evidence to support an opinion; how well the source explains the opinion; whether the source has a specialty or area of expertise related to the individual's impairment; and any other facts that tend to support or refute the opinion. SSR 06-03p, 2006 WL 2329939, at \*4-5.

The ALJ considered appropriate factors and sufficiently explained the weight he accorded LPCC Ewins' opinion. The ALJ explained that LPCC Ewins' assessment was completed in "late 2013."[27] The ALJ explained that it had been five months since LPCC Ewins last saw Ms. Herrera when she completed the medical source statement and listing forms. (Tr. 132.) The record supports this finding. (Tr. 1092.) The ALJ also explained that LPCC Ewins indicated in her medical source statement that Ms. Herrera had mostly *slight* limitations in social interaction, yet indicated on two of the listing forms that Ms. Herrera had *marked* limitations in maintaining social functioning. (Tr. 133.) The record supports this finding. (Tr. 1095-97.)

---

[27] *See* fn. 8, *supra.*

Although Ms. Herrera argues that LPCC Ewins' treatment notes support the severity of her opinion, this argument asks the Court to reweigh the evidence. (Doc. 16 at 18.) Here, the Administrative Record contains only *two* progress notes, not five as Ms. Herrera represents.[28] (*Id.,* Tr. 1085, 1086.) Therein, LPCC Ewins' indicated Axis I diagnoses of Adjustment Disorder With Mixed Disturbance of Emotion and Conduct, Dysthymic Disorder, Major Depressive Episode (single) by history; and Bereavement by history, but assessed GAF scores of 56, indicating *moderate* symptoms.[29] (Tr. 1085, 1086). Further, LPCC Ewins indicated some minimal improvement over the course of treatment, but also noted that Ms. Herrera had not followed up on assignments and had dropped out of counseling. (Tr. 1092.) Thus, the ALJ's finding that her treatment notes are inconsistent with her opinion is supported by the record. *Oldham,* 509 F.3d at 1257-58.

For the foregoing reasons, the Court finds that the ALJ applied the correct legal standard in evaluating LPCC Ewins' opinion and sufficiently explained the weight he accorded her opinion. SSR 06-03p, 2006 WL 2329939, at *6. There is no reversible error on this point.

### C.     Alvin Smith, M.D.

On March 9, 2009, State agency nonexamining psychological consultant Alvin Smith, M.D., reviewed Ms. Herrera's medical records and prepared a Psychiatric Review Technique[30]

---

[28] Ms. Herrera cites to five records - two of which relate to the same date (03/07/2012), another two of which relate to the same date (12/19/2012), and one that was authored by LMSW Hogland. (Doc. 16 at 18.)

[29] *See* fn. 16, *supra.*

[30] "The psychiatric review technique described in 20 CFR 404.1520a and 416.920a and summarized on the Psychiatric Review Technique Form (PRTF) requires adjudicators to assess an individual's limitations and restrictions from a mental impairment(s) in categories identified in the "paragraph B" and "paragraph C" criteria of the adult mental disorders listings. The adjudicator must remember that the limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process." SSR 96-8p, 1996 WL 374184, at *4. Dr. Smith rated Ms. Herrera as having no functional limitations in her activities of daily living, no functional limitations in maintaining social functioning, and no episodes of decompensation. (Tr. 581.) He further rated Ms. Herrera as having moderate limitations in maintaining concentration, persistence, and pace. (*Id.*)

and a Mental Residual Functional Capacity Assessment ("MRFCA").  (Tr. 571-87.)  In Section I of the MRFCA, Dr. Smith assessed that Ms. Herrera was *not significantly limited* in her ability (1) to remember locations and work-like procedures; (2) to understand and remember very short and simple instructions; (3) to carry out very short and simple instructions; (4) to sustain an ordinary routine without special supervision; (5) to make simple work-related decisions; (6) to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (7) to ask simple questions or request assistance; (8) to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (9) to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; (10) to respond appropriately to changes in the work setting; (11) to be aware of normal hazards and take appropriate precautions; and (12) to travel in unfamiliar places or use public transportation.  (Tr. 585-86.)  Dr. Smith also assessed that Ms. Herrera was *moderately limited* in her ability to (1) understand and remember detailed instructions; (2) to carry out detailed instructions; (3) to maintain attention and concentration for extended periods; (4) to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (5) to work in coordination with or in proximity to others without being distracted by them; (6) to interact appropriately with the general public; (7) to accept instructions and respond appropriately to criticism from supervisors; and (8) to set realistic goals or make plans independent of others. (*Id.*)  In Section III of the MRFCA, Dr. Smith explained that

> [t]he claimant can understand, remember and carry out simple instructions, make simple decisions, attend and concentrate for at least 2 hours at a time, interact adequately with co-workers and supervisors and respond appropriately to changes in the workplace.[31]

---

[31] This narrative tracks the general requirements for unskilled work.

> She did not return adl forms, so we cannot evaluate her alleged limitations, but she apparently is taking care of herself and her daughter, which would indicate the capacity for simple work.

(Tr. 587.)[32]   The ALJ, in turn, assessed that Ms. Herrera could do simple work, make simple decisions, and could maintain concentration, pace, and persistence for two hours before taking a regularly scheduled break and returning to work throughout the workday.  (Tr. 135.)

Ms. Herrera argues that the ALJ accorded probative weight to Dr. Alvin Smith's medical assessment, but failed to account for *all* of Dr. Smith's Section I moderate limitations in the RFC assessment, thereby engaging in inappropriate picking and choosing from Dr. Smith's opinion. (Doc. 16 at 20-21.)   The Commissioner contends that the ALJ appropriately relied on Dr. Smith's Section III functional assessment which stemmed from Dr. Smith's Section I findings, and that the ALJ permissibly carried out his evaluation of the medical and credible nonmedical evidence in assessing Ms. Herrera's RFC.  (Doc. 17 at 9-11.)

Tenth Circuit case law requires ALJs to consider the entire MRFCA.  *See Nelson v. Colvin,* 655 F. App'x 626, 629 (10th Cir. 2016) (unpublished)[33] (finding no reversible error regarding the ALJ's mental RFC assessment because the ALJ effectively accounted for *all* the limitations indicated in Section I of the MRFCA) (emphasis in original); *Lee v. Colvin*, 631 F. App'x 538, 541-42 (10th Cir. 2015) (finding no reversible error regarding the ALJ's RFC assessment because the ALJ did not ignore the Section I limitations and the RFC assessment reflected the moderate limitations identified in Section I of the MRFCA); *Carver v. Colvin*, 600 F. App'x 616, 619 (10th Cir. 2015) (unpublished) (explaining that an ALJ cannot turn a blind eye

---

[32] On February 18, 2010, nonexamining State agency psychological consultant Donald Gucker, Ph.D., reviewed Ms. Herrera records at reconsideration and affirmed Dr. Smith's Psychiatric Review Technique Form and MRFCA. (Tr. 660.)

[33] Unpublished decisions are not binding precedent in the Tenth Circuit, but may be cited for their persuasive value. *United States v. Austin*, 426 F.3d 1266, 1274 (10th Cir. 2005).

to moderate Section I limitations, and that if a consultant's Section III narrative fails to describe the effect of Section I limitations on a claimant's ability, or contradicts certain Section I limitations, the MRFCA cannot properly be considered part of the substantial evidence supporting an ALJ"s RFC finding); *see also Smith v. Colvin*, 821 F.3d 1264, 1268-69 (10th Cir. 2016) (finding that an ALJ need not incorporate verbatim the moderate nonexertional limitations found in Section I if the ALJ incorporates the functional aspects of a claimant's nonexertional limitations assessed in Section III).[34]

The ALJ's RFC assessment sufficiently incorporated the functional aspects of Ms. Herrera's nonexertional limitations assessed in Dr. Smith's Section III narrative. Here, Dr. Smith applied his Section I findings and concluded in Section III that Ms. Herrera was functionally capable of unskilled work.[35] The MRFCA is therefore considered part of the substantial evidence supporting the ALJ's RFC assessment. *Carver*, 600 F. App'x at 619. In

---

[34] In *Smith*, the plaintiff argued that the ALJ erred in omitting moderate nonexertional impairments in assessing her RFC. Specifically, one evaluation found the Plaintiff to be moderately limited in her ability to

- maintain concentration, persistence and pace,
- remain attentive and keep concentration for extended periods,
- work with other without getting distracted,
- complete a normal workday and workweek without interruption from psychologically based symptoms,
- perform at a consistent pace without excessive rest periods,
- accept instructions and respond appropriately to criticism by supervisors,
- get along with coworkers or peers without distracting them or engaging in behavioral extremes,
- respond appropriately to changes in the workplace, and
- set realistic goals or independently plan.

*Id.* at 1268. Applying these assessments from Section I of the MRFCA, the nonexamining State agency medical consultant found in Section III that the plaintiff could "(1) engage in work that was limited in complexity and (2) manage social interactions that were not frequent or prolonged." *Id.* The ALJ in *Smith* "arrived at a similar assessment," concluding that the plaintiff "could not engage in face to face contact with the public and could engage in only simple, repetitive and routine tasks." *Id.* at 1269. The Tenth Circuit found that, while the ALJ "did not repeat the moderate limitations assessed by the doctors" he sufficiently "incorporated these limitations by stating how the claimant was limited in the ability to perform work-related activities." *Id.* The Tenth Circuit also clarified that it is the narrative portion of the MRFCA form that controls the ALJ's assessment. *Id.* at n. 2.

[35] *See* SSR 96-9p, 1996 WL 374185, at *9 (explaining that unskilled work generally requires the ability to understand, remember and carry out simple instructions, make judgments that are commensurate with the functions of unskilled work – *i.e.,* simple work-related decisions; respond appropriately to supervision, co-workers and usual work situations; and deal with changes in a routine work setting).

turn, although the ALJ's RFC assessment did not repeat verbatim Dr. Smith's Section III narrative, the ALJ's RFC assessment nonetheless captured the essence of the Section III functional limitations. *Id.* at 620. For example, Dr. Smith addressed Ms. Herrera's moderate limitations in understanding and memory and assessed that she could understand, remember and carry out simple instructions and make simple decisions. (Tr. 587.) Similarly, the ALJ assessed that Ms. Herrera could do simple work and make simple decisions. (Tr. 134-35.) Dr. Smith addressed Ms. Herrera's moderate limitations in sustained concentration and persistence and assessed that Ms. Herrera could concentrate for at least 2 hours at a time. (Tr. 587.) The ALJ assessed that Ms. Herrera could maintain concentration, pace and persistence for two hours before taking a regularly scheduled break and returning to work throughout the day. (Tr. 135.) Although the ALJ excluded certain of Dr. Smith's narrative language; *i.e.,* that Ms. Herrera *could* interact adequately with co-workers and supervisors and respond appropriately to changes in the workplace, it does not render his RFC assessment not supported by substantial evidence. To the contrary, the ALJ expressly relied on Dr. Smith's Section III narrative (Tr. 137), and Ms. Herrera has not pointed to any evidence, nor can the Court find any, that the ALJ rejected Dr. Smith's assessment related to Ms. Herrera's social interaction and adaption. Thus, Ms. Herrera's argument that the ALJ engaged in inappropriate picking and choosing from Dr. Smith's opinion necessarily fails. Additionally, Ms. Herrera's argument that the ALJ should have accounted for *every* moderate limitation Dr. Smith assessed in Section I also fails because Dr. Smith's Section III narrative adequately captured the limitations he found in Section I, and the ALJ's RFC adequately incorporated the functional aspects of a claimant's nonexertional limitations assessed in Dr. Smith's Section III narrative. *Smith*, 821 F.3d at 1269. For these reasons, there is no reversible error as to this issue.

**Conclusion**

For the reasons stated above, Ms. Herrera's Motion to Reverse and Remand for Rehearing (Doc. 17) is **DENIED.**

KIRTAN KHALSA
**United States Magistrate Judge,**
**Presiding by Consent**